Maps v. Cooper.

*Decree unanimously reversed.*

SOLOMON MAPS, appellant,

*v.*

THOMAS W. COOPER et al., respondents.

Where the trustees of a corporation gave a bond, secured by a mortgage on the corporate property, which, in strict legal effect, bound them individually, a court of equity will enjoin an action at law against them thereon, if it appears that there was no intention on their part to become personally liable.

*Mr. Robert Allen, Jr.,* for appellant.

*Mr. Wilbur A. Heisley,* for respondents.

On appeal from a decree advised by Vice-Chancellor Bird, whose conclusions are as follows :

On April 3d, 1862, William R. Maps and others, residents of Long Branch, filed, in the clerk's office of the county of Monmouth, a certificate in which they express their intention to form themselves into a religious denomination, and take upon themselves the name of " The Trustees of the Methodist Episcopal Church of the village of Long Branch." They purchased a lot and built a house for worship. On these they executed a mort-

gage to Maps & Slocum for $5,700. December 13th, 1870, Maps & Slocum assigned this mortgage to the defendant, Solomon Maps. After this, the church erected a new edifice and denominated it "The Centenary M. E. Church of Long Branch," without any alteration of the certificate above referred to. In this undertaking the church became largely indebted, and having an opportunity to borrow money of the Long Branch Building and Loan Association, which would only loan on first mortgage, a committee was appointed by the trustees of the church to wait on Solomon Maps and request him to consent to the cancellation of his mortgage and to accept another in lieu thereof, but subsequent to the one proposed to be given to said building and loan. The committee waited upon the defendant. At that first interview he declined to comply, but promised to see them again; he did so, and consented to their request. The committee reported to the board of trustees that he was willing to cancel his mortgage, take another and come in second. The board passed resolutions in conformity thereto, executed and delivered a first mortgage to the building and loan association and a second one to the defendant, which he accepted, and surrendered the one which he had held for years, and which was first, for cancellation. It was canceled, the building and loan mortgage was then placed on the record, and after that the defendant's second mortgage. Afterwards the building and loan foreclosed their mortgage, made the complainant a party, sold the premises, and Solomon Maps, the defendant in this suit, purchased, but at a price greatly below the amount due on both mortgages.

After the defendant had held the title for some time, the same congregation, under the name of "St. Luke's M. E. Church," negotiated with him for the purchase of the premises, and he made title to them. He did not realize enough to save himself from loss by over $3,000.

After all this, the defendant commenced an action at law against the complainants in this suit for the recovery of the balance due upon his bond. This suit in equity has been instituted to restrain that action, and to declare the true intention of the parties to the transaction.

All the above-stated facts are well established. The defendant in this suit says that he commenced his action at law because the complainants in this suit were individually liable to him for the amount still due on his bond. He makes a strenuous effort to establish their liability by showing that they induced him to surrender his mortgage and come in subsequently to the building and loan, by promising that they would become individually responsible to him for any loss.

The proof does not satisfy me that there was any such undertaking on the part of the two who, as a committee, waited upon Mr. Maps. I do not find a particle of proof connecting the other five members of the board of trustees with any promises or undertaking whatever with Mr. Maps, except so far only as they became liable by signing the bond in the manner or form they did. Each one signed his own name both to the bond and mortgage. But from the answer and the course of the examination of witnesses, the effort was to prove that they signed in this manner because they had so agreed with Mr. Maps, thereby intending personally to bear any loss which he might otherwise sustain. This effort, I think, has failed, because five of the trustees never made any contract whatever with Mr. Maps as to their individual responsibility. It does not appear that they saw Mr. Maps. The only persons who did see him were Slocum and Wardell, who were authorized by a resolution of the board of trustees to wait on Mr. Maps and procure his consent to take the second place. There is no evidence beyond this. Wardell and Slocum swear that they did not speak of nor undertake anything else. Some effort is made to prove the contrary by the oaths of Mr. Maps, Mrs. Maps and a daughter, but, I am free to say, it comes far short of convincing me, whatever they may have understood respecting it. But suffice it to say that as to the five trustees, the other two could not bind them personally. Therefore, if I had found that any promises had been made to Mr. Maps, by the two, on which to found an equitable decree, it could not be extended beyond the two who ventured to make the promises. The belief that there was no contract or promise of individual liability is strengthened by the fact that Mr. Maps accepted a

bond in which the said seven individuals as "Trustees in Trust of the Centenary M. E. Church of Long Branch," "and their successors or assigns," obligated the payment, and by the fact that after the foreclosure and sale under and by virtue of the building and loan mortgage, Mr. Maps frequently spoke of the transaction as a financial loss to himself, and also by the fact that he never called upon either of the bondsmen for payment, individually, up to the time he commenced his action at law.

It is further to be considered that Mr. Maps certainly regarded this bond as the bond of the corporation, for it was executed in the same informal and irregular, if not unlawful, manner as the mortgage was. Neither instrument was so executed as to bind the corporation in an action at law. The corporation had adopted a name and a seal; to these instruments neither was affixed; nor was either affixed to the bond and mortgage given to the building and loan; nor to the bond and mortgage which Mr. Maps had long before taken an assignment of, and held as the bond and mortgage of the corporation, and which he treated as its obligations.

I remark, again, that this bond was executed in the same manner as the mortgage which was given on the real estate of the corporation to secure the payment of the bond, and that Mr. Maps treated that mortgage so executed as the mortgage of the corporation, and under it, and another similarly executed, he accepted title to valuable real estate, and undertook to convey a good title to it for a large sum of money. I infer from this fact that if Mr. Maps regarded the mortgage as the deed of the corporation, it is most fair to presume that he so regarded the bond.

But it is said that whether there was an agreement established that the individuals who signed were to be bound individually or not, they did, by the bond which they signed, and which Mr. Maps accepted, so bind themselves. The bill admits that this is the legal effect of the instrument as it stands, but insists that it was the intention and understanding of all parties to bind the corporation only, and prays this court so to. decree, and to perpetually enjoin the defendant in this suit from prosecuting his action at law. I think that the facts above recited, out of which

the defendant attempted to establish an agreement between him-self and the trustees, before the bond was executed, that they should become personally bound, not only establish that there was no such previous understanding, but, with great certainty, establish that all parties intended to contract for and with the corporation alone. I need not cite authorities to show that under such circumstances the court has the power to grant relief, and that it is its duty so to do. And this rule is most reason-able and just. For as these papers stand, the defendant, Mr. Maps, could not have proceeded against the corporation, had the corporation resisted. Suppose, when he offered his mortgage in the foreclosure suit above named, the corporation had said: " Our church property is not bound, because the corporation has not, as such, executed the mortgage on which you rely," most certainly Mr. Maps would have been accorded relief in this court, had he prayed for it.

I will advise a decree accordingly.

The decree was affirmed without any opinion being delivered on behalf of the majority of the court.

PATERSON, J., delivered the following dissenting opinion :

My conclusion differs from that reached by a majority of the court, and I think the peculiarity of the attending circumstances calls for more than a mere signification of dissent. The bill admits the legal liability of the obligors, by reason of the in-formal and irregular execution of the bond. In this the opinion below concurs, and so but a single question remains for deter-mination. That is, are the facts such as to entitle the complain-ant appellees to relief? In my opinion, no equitable interfer-ence is warranted, and for these reasons.

It is established that two bonds similar in form, and also in the want of a lawful ingredient of that kind, were executed by the trustees to Mr. Maps. One was given to replace the other, and by the exchange, the appellant retained a subsequent instead of a prior encumbrance on the premises described in the mort-

gages. Upon the circumstances, and under the representations by which one of that pair of securities was substituted for the other, the *status* of the parties in a court of equity must depend.

Now, it is apparent, from the evidence, and established just as clearly as the execution of the double securities, that the negotiation for the transfer was initiated and pursued by the complainants. They, and not the defendants, moved in the matter, and, as is demonstrated, most fully for their own advantage and benefit. This is a valuable factor or element in considering the case, and should be kept steadily in the foreground. The testimony throughout is all one way as to this. Mr. Maps had no connection with the religious society of which the complainants were trustees, was not interested in its welfare or prosperity, and does not appear as a contributor to its temporal wants, much less as a lay brother or class-leader in spiritual affairs. The appellees could not approach him with such an inducement, nor offer it as a make-weight to their argument. Here then, is a transaction begun, continued and completed by the trustees, on their own motion, and of their own volition, which all of them testify, to use the words of one, " was done for the benefit of the church and church property," initiated at an official meeting, a committee appointed to wait on the mortgagee, and ask or persuade him. I quote again, " to release the mortgage he held, and take one behind that of the building loan," for no additional consideration, an exchange proposed by the officers of a religious body, to an old man, almost a centenarian, though not a member of their centenary society, not versed in legal business, possessed of little or no other property, and aided by no legal advice, the prominent actors, one after the other, coming forward and disclosing facts, creditable, it may be, to business sagacity and selfish instincts, but the contrary, in other respects—here, I say, is a transaction which these managers of a Christian church bring before a court of equity as coolly as they sought relief from their mortgagee on a previous occasion, and urge that as a reason for relief here for transferring the burthen of a debt of their own creation from themselves, the rightful obligors, and fastening it for all time on one whom they sought, and success-

fully, to part with a good and primary for an insufficient and secondary security. What is it but saying virtually to Mr. Maps, at the time of the negotiation, in language something like this: We can raise money to improve our church property, if you will consent to exchange the mortgage you hold for a subsequent security of that nature. Our object is to promote the advantage and interest of the society, and an opportunity is offered of obtaining a loan by your assistance. We can promise no additional consideration for complying with our request, as we do not intend to incur any personal liability in the matter. We are not now responsible, and do not mean to become so. We will be frank, and tell you we will give you only another bond and mortgage of a character similar to what you have now, but as the new one we propose to execute will be to a building loan association, the principal will be reduced by monthly payments, and you can be benefited to that extent. What we desire to raise is some $7,000, and we come as a committee from the trustees, to ask you to have a mortgage for that amount set before the one you hold for $4,700. You see it is a modest request, good sir, and also the dilemma in which we are placed. We will not help ourselves by taking any responsibility, but we want you to assist us in the way we have devised and point out to you now. It is easy to do so, for you have only to assume all risk, and do for us what we will not do for ourselves.

This is no exaggerated or highly-colored representation of what actually occurred during the negotiations, and is warranted most fully by the evidence spread upon the record by the complainants. On this ground, clearly, the appellees are entitled to no relief as against Mr. Maps. No one of them was willing to assume, and all were anxious to disclaim, any responsibility for an act which they say, expressly, was intended to promote the benefit of the religious society with which they were connected, but are ready and quick in asserting that their mortgagee agreed to do for them just that thing, without consideration or motive, beyond their simple request, and with full knowledge of his act. If Mr. Maps had been shown to be a religious fanatic, and one who had contributed freely and lavishly, or wasted his money

Maps *v.* Cooper.

for religious purposes, such a thing might have been urged with some degree of plausibility, but, so far as appears from the depositions, he seems rather more of a sinner than a saint, excepting in this case.   There is this to be said further just here, that the action of the committee, unless disclaimed, was the action of all.

Again, the legal effect of the instrument, as it stands, is to bind the obligors, and that being so, why should equity interpose, and relieve those obligors from a debt all say was incurred for the benefit of a society in which they were interested, but where Mr. Maps is not shown to have united with them even so much as in singing a doxology?   It is said he could not have foreclosed against the society if that had been contested, but the latter did not resist, and so that consideration is eliminated here. The trustees were advised, no doubt, what would be the effect of a successful defence to such a proceeding, and that want of formality, while fatal to the mortgage, would but make them liable for the full condition of the bond.   Their legal guide mapped out for them a wiser policy, and one that has proved to exempt them from any liability.   In the view I have taken, it is immaterial how Mr. Maps or the trustees regarded the mortgage, or whether the former could have obtained relief under a different state of things; we are dealing with cold facts, not ideal suppositions.   The one grand controlling equity feature of the case is, that the debt is that of the society, and not of Mr. Maps, and as the cold steel of the law will compel the trustees to make restitution to him for what part of their obligation he has paid, the law should be left unrestrained, and its trenchant blade free to do the proper work of right.

For affirmance—CHIEF-JUSTICE, DEPUE, DIXON, KNAPP, PARKER, REED, SCUDDER, VAN SYCKEL, BROWN, CLEMENT, COLE—11.

For reversal—PATERSON—1.